154 So. 553

### JEMISON & CO., Inc., v. ENSEY.
#### 6 Div. 250.

Supreme Court of Alabama.
March 29, 1934.

Rehearing Denied May 24, 1934.

Stokely, Scrivner, Dominick & Smith, of Birmingham, for appellant.

Harsh, Harsh & Hare, of Birmingham, for appellee.

BOULDIN, Justice.

The cause of action is tersely stated in the complaint as follows:

"Plaintiff claims of defendant Five Thousand ($5,000.00) Dollars as damages for the breach of a verbal contract entered into by plaintiff with defendant heretofore to-wit: September 1927, by which defendant agreed with plaintiff to complete and finish, as a turn-key job, within a reasonable time, a certain brick bungalow which plaintiff was negotiating with one S. B. Johnston to buy and which was at the time unfinished and which brick bungalow was upon Lot 222, according to Hollywood Land Company's Survey, situated in Hollywood, now in the town of Homewood, Jefferson County, Alabama.

"Plaintiff avers that plaintiff had declined to complete or carry out the purchase of said lot with said unfinished bungalow on same, and defendant agreed to finish same as aforesaid upon consideration that plaintiff would complete said trade and pay to it certain money, to-wit: Fifteen Hundred ($1500.00) Dollars, and also quit-claim to it certain strip of five feet in part of said Lot No. 222.

"Plaintiff avers that although he, the plaintiff, complied with all the terms of said contract upon his part, the defendant has failed to finish said bungalow as aforesaid."

Then follows alleged damages. Pleas were in short by consent.

The main question raised on this appeal is the identity of the party making the contract to complete the residence for the plaintiff.

The question is raised by the affirmative charge refused to defendant, and on motion for new trial directed to the weight of the evidence.

Plaintiff claims his contract was made with Jemison & Company, Inc., while defendant claims it was made with Jemison Mortgage & Trust Company.

These are separate corporate entities, and the cause was submitted to the jury on the theory that one or the other, and not both, was bound by the contract.

Without dispute the contract was made with A. B. Tanner, who was at the time vice president of both corporations. Assuming, for the present, his authority to act for either in making such contract, we may say in short the evidence is in conflict as to which corporation he was acting for, and the affirmative charge was properly refused.

We deem it proper, however, to present as briefly as may be the picture disclosed by the record as affecting the sufficiency of the evidence to support the finding of the jury, and the authority of Mr. Tanner to bind Jemison & Company.

There were several affiliated corporations doing business in the same offices in the Jemison Building in Birmingham.

The letterhead in use was this:
"THE JEMISON COMPANIES
"JEMISON & COMPANY, INC. —— JEMISON REALTY COMPANY, INC.
"Mortgage Loans    Real Estate and Rentals.
"JEMISON MORTGAGE AND TRUST COMPANY
"Investment Bankers
"BIRMINGHAM, ALA."

Names of officers were listed on the margin, among them, A. B. Tanner, vice president and treasurer.

The board of directors and officers of Jemison & Company and of Jemison Mortgage & Trust Company were the same men.

This lot 222 in Hollywood was owned in the first instance by Mrs. Ramona M. Creedon. She and her husband, J. F. Creedon,

had entered upon rather an extensive business, buying, building, and selling residence property in the Birmingham area.

Jemison & Company had made mortgage loans to them in large amounts, among them a first mortgage on this lot for $9,800. While the residence was still uncompleted, the Creedons sold the property to S. B. Johnston, who gave a second long term installment mortgage of $2,200. The Creedons were to complete the residence. Thereafter, the plaintiff, Ensey, negotiated with Johnston for the property, and before closing the deal the Creedons executed a deed of trust to Jemison Mortgage & Trust Company. The occasion and general purpose of the trust are shown in the opening paragraphs of the trust deed as follows:

"The owner has over a period of months been purchasing parcels of real estate and contracting thereon residences and other structures for sale. The contracting work and work of construction in connection therewith has been done by the owner's husband, J. F. Creedon, as agent for the owner, with full power and authority from the owner to said J. F. Creedon to act for and in her behalf in any and all matters pertaining to said business.

"At the present time the owner is largely indebted for bills for materials purchased for use in the construction of said houses, and in the construction of houses for third parties by the owner as contractor acting by and through her said agent, J. F. Creedon, and her indebtedness on this account has become so intensive that she is under some difficulty in carrying to completion some of the houses under construction, and her title and the title of the mortgagees who have advanced money to the owner on mortgage liens against the owner's property is in danger of impairment by the filing of materialmen's liens against all or some part of the structures so built or under construction. Said indebtedness has been variously incurred in the name of the owner, of said J. F. Creedon, and of Creedon and Meadows.

"The owner desires to secure the best possible result in the completion and sale of the said structures with a view to payment in full of all materialmen's claims and all claims of any creditors of the owner and proper protection of said mortgagees and of the owner in her equity in the property, and to that end desires the Trustee to make and hold the property herein described as Trustee under the terms and provisions hereof."

The deed conveyed to the trustee many lots and parcels of land shown in schedule No. 1, and personal assets in schedule No. 2.

Lot 222 was not listed in the lands conveyed. It had been sold to Johnston. But the second mortgage from Johnston to the Creedons was included in the personalty schedule; and a schedule of mortgage liens to be protected by the trust included the Jemison & Company mortgage for $9,800.

Touching the completion of buildings, the trust deed provided: "The Trustee shall to the extent to which the Trustee may be able complete the construction of all structures now in course of construction on any of the property herein described." And: "The Trustee may to any extent that it may deem desirable employe such parties at such compensation and upon and under such conditions as it may see fit to assure the completion of the construction of all of said structures, and of any other structures which the Trustee may determine to build hereunder."

Plaintiff, according to his evidence, being advised that Jemison & Company was now the party to complete the building he was negotiating for, was referred to Mr. Tanner as the man to do business with.

As contemplated in negotiations with Creedon and Johnston, it was arranged to pay off the second mortgage given by Johnston, $2,200, and accordingly plaintiff did pay $1,500 by check payable to Jemison & Company.

This check was filled out in the office under Mr. Tanner's direction for plaintiff's signature, and a receipt given by Jemison & Company for that sum. At the same time the balance of $700 was paid by deed of a strip five feet in width off one side of the lot. This deed was made to Jemison Mortgage & Trust Company. We may note here that Jemison & Company held a first mortgage on this strip in connection with lot No. 221.

Defendant's evidence tends to show that Jemison & Company in regular course of business collected for other Jemison companies, and adjusted accounts by proper entries upon the books; that the $1,500 was collected for account of Jemison Mortgage & Trust Company and was so entered or transferred later.

It appears Jemison & Company was directly interested in the completion of this house on lot 222. Metropolitan Life Insurance Company was taking over Jemison & Company mortgages. It was important to have a showing that the buildings were completed before the Insurance Company would take them.

The plaintiff was later requested to sign and did sign a document showing the build-

ing was completed. This instrument ran in favor of Jemison Mortgage & Trust Company, trustee; but plaintiff and witnesses testify that this was done on the assurance that Jemison & Company would complete the building, and it was being given in advance to aid in getting the money for that purpose. Soon thereafter, the $9,800 mortgage was negotiated to Metropolitan Life Insurance Company.

Further evidence tends to show the superintendent in charge of completing buildings, including this one, was employed by the trustee, Jemison Mortgage & Trust Company; further evidence that the architect supervising the work was in the employ of Jemison & Company.

It further appears Jemison & Company carried a ledger account against this lot for outlays from and before the date the $9,800 mortgage was given and running on down to the end of the year 1927, two months after this transaction, among the items being pay roll of November 19th. A balance due Jemison & Company of $742.38 was transferred to account of Jemison Mortgage & Trust Company December 31, 1927.

We would observe that plaintiff, at the time of the transaction with Mr. Tanner, was evidently contemplating an absolute obligation to complete the building for which he was then paying a consideration to Jemison & Company.

There is conflict between the parties as to whether plaintiff was told the improvement would be made by the trustee. It does not clearly appear he was advised of the nature of the trust deed, nor that he was looking to a trustee subject to unknown limitations to perform the contract.

Upon consummating this transaction, the prime, if not sole, interest of the obligor, in completing the building, was the protection of the mortgage of Jemison & Company and facilitating its assignment.

[█] Without prolonging the discussion, we are impressed the question whether Jemison & Company was contracting, and directing how the several documents be executed, or Jemison Mortgage & Trust Company as trustee was contracting, and having the cash payment made to Jemison & Company, was for the solution of the jury.

[██] Plaintiff cannot be held to have dealt with one corporation at one moment, and with another the next, in one and the same transaction with the same officer, in the absence of notice of the change of parties. Knowledge on the part of the acting officer that the other party is dealing with him as representative of the one, renders it the contract of that one. We need not consider when both may be bound.

We find no such clear preponderance of evidence as would overcome the presumption in favor of the jury's finding, and call for setting aside their verdict as manifestly and clearly wrong.

Evidence running through the entire record discloses Mr. Tanner was not a vice president with the nominal powers attaching to the name. It is not questioned that he had the power to close this transaction as vice president of Jemison Mortgage & Trust Company. His testimony discloses he had like powers as vice president of Jemison & Company in dealing with properties in which that company had the dominant interest. The record discloses he was an executive vice president for both concerns, much like a general manager in this line of corporate business.

Defendant was not due the affirmative charge for want of evidence of his authority.

[█] One Newbourne, the superintendent of the work of completing the house, was sent to procure the advance written showing that the house had been finished. Newbourne, as a witness, testified he then told plaintiff Jemison & Company would finish the house. This was not subject to the objection that Newbourne was not shown to have authority to speak for Jemison & Company. The evidence was admissible as going to the inducement to plaintiff to sign the paper in advance of completion for purposes before mentioned.

[█] It was competent for Mr. Jones, an experienced builder of houses of this type in that vicinity, and Mr. Van Arman, the architect, to testify wherein the house was incomplete as a "lock and key" job.

Such evidence was proper as to incomplete portions, defective workmanship or material, or want of essential parts of such job, such as permanent, instead of temporary, pillars. While plans and specifications were not at hand, we cannot say that such experts cannot discern from the building wherein there is incompleteness in these lines.

Neither can it be said as matter of law that these shortages were not discernible four years after the house was built, the date when examined by Mr. Jones.

We have considered other matters presented in brief and find in them no ground of

reversal, and deem special treatment unnecessary.

Affirmed.

ANDERSON, C. J., and GARDNER and FOSTER, JJ., concur.